STATE

v.

Brian DENNIS.

No. 2003–58–C.A.

Supreme Court of Rhode Island.

March 17, 2006.

Virginia M. McGinn, Providence, for Plaintiff.

Paula Lynch, East Greenwich, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

### Introduction

Justice ROBINSON for the Court.

The defendant, Brian Dennis, was indicted for the rape (two counts) and kidnapping of a woman to whom we will refer in this opinion as "complainant." After a suppression hearing concerning a disputed videotaped statement that the defendant made,[1] a trial was held. At the conclusion

1. The defendant timely moved to suppress a videotape containing a statement that he made at the police station on the day of his arrest. After a jury was empaneled but before

of the trial, the jury convicted the defendant of one count of first-degree sexual assault, while simultaneously acquitting him of the second count of first-degree sexual assault and of the kidnapping charge. He was sentenced to thirty years of imprisonment, with seventeen years to serve and the remainder suspended with probation.

The defendant has appealed to this Court, contending that the denial of his motion to suppress his videotaped statement to the police constituted reversible error and that, therefore, the judgment of conviction should be vacated. As an additional basis for his appeal, defendant argues that the trial justice's failure to instruct the jury on its duty to make a determination about the voluntariness of defendant's videotaped statement constituted a violation of Rhode Island's "Humane Practice Rule." He further contends that the trial justice committed reversible error by improperly excluding from consideration by the jury: (1) evidence relating to his guardianship status; (2) testimony regarding a statement allegedly made to him by the police at the time of his interrogation at the police station; (3) evidence that complainant had in the past falsely accused another person of rape; and (4) certain evidence relative to particular aspects of the prior consensual sexual relationship between complainant and defendant.

For the reasons set forth herein, we sustain defendant's appeal, we vacate his conviction, and we remand the case to the Superior Court for retrial.

## Facts and Travel

The complainant and defendant met and began a consensual sexual relationship one evening in or around January of 2000. After approximately two months of dating, complainant, together with her daughter from a previous relationship, moved into defendant's apartment on the second floor of a two-family house that he owned with his mother in Pawtucket, Rhode Island.

While complainant and defendant were living together, they argued frequently; and, within two months, complainant and her daughter moved out. Nevertheless, the volatile relationship between the two adults continued on and off, even after complainant moved out; and it is undisputed that the couple continued to engage in consensual sexual relations at various times between June and August of 2000.

On August 25, 2000, complainant's sister spoke with defendant by telephone and arranged to baby-sit for complainant's daughter so that complainant and defendant could go out together that evening. On that evening, the couple had dinner and drinks at a Chinese restaurant in nearby South Attleboro, Massachusetts, and then proceeded to drive to defendant's apartment, where defendant put some laundry in the dryer and complainant used his telephone to call and check on her daughter. Shortly thereafter, they left defendant's apartment and drove to a club called the Newport Deck. They never actually entered the club, however, because they began to argue in the parking lot. The complainant testified (and defendant acknowledged) that, after they began arguing, complainant made repeated requests to go home.

There is substantial conflict between the trial testimony of defendant and that of complainant as to what transpired after they left the premises of the Newport

the actual trial commenced, the trial justice excused the jury and conducted a hearing with respect to that motion to suppress.

Deck. The complainant testified that, after leaving the Newport Deck, defendant drove her to a location known as Parens Marina[2] and that, while there, defendant was angry and insulted her, saying that she was worthless and that he was going to rape her. She also testified that, as they were driving away from Parens Marina, defendant threw her pocketbook out of his truck window, but then stopped and retrieved it when she told him that it contained her daughter's medical records.

The complainant further testified that, after they left Parens Marina, defendant drove her back to his apartment over her repeated objections and requests to go home. She said that, upon arriving at his house, defendant dragged her out of the truck by grabbing her shirt and pushing her forward towards the staircase leading to his apartment on the second floor. The complainant also testified that she banged on the house in the hope of waking defendant's mother.[3] She further stated that she was then able to run away from defendant, but that he caught up with her and grabbed her, tearing her shirt.

According to complainant's testimony, defendant then shoved her back into the truck and proceeded to drive to a liquor store, where she waited in the truck while he went into the store and purchased a six-pack of beer. She testified that, after leaving the liquor store, defendant eventually drove her to her own apartment.

The defendant's version of the events following the argument outside the Newport Deck begins with the couple driving from that club to defendant's home. While defendant acknowledged in his testimony that complainant had asked him to take her home, he stated that he felt he would be able to calm her down. The defendant testified that complainant left the truck on her own, but that she then stood immobile next to the door of the truck, whereupon he put his arm around her waist and walked her up to the steps leading to the side door of his apartment. He further testified that he went up the steps to unlock the door and that, when he turned around, complainant was gone. The defendant said that he then saw complainant running away and ran to catch up with her and that, upon catching up to her, he gently walked her back to his truck. The defendant testified that at that point complainant did not ask to be taken home.

According to defendant's testimony, he then drove to a liquor store, where he purchased a six-pack of beer, and he and complainant then proceeded to drive to Parens Marina. (He testified that complainant did not ask to be taken home after leaving the liquor store.) The defendant stated that, after they arrived at Parens Marina, he opened a beer, offered it to complainant, but when she declined he drank it himself. He testified that she looked fearful at first, but that she gradually became comfortable. The defendant further testified that, after staying at Parens Marina for approximately fifteen minutes, complainant again began asking him to take her home. He conceded that he did drop complainant's pocketbook out of the truck window as they left Parens Marina, but he added that he did it so that she would stop talking and that he quickly retrieved it for her. The defendant testified that he then drove complainant to her home.

2. The record indicates that Parens Marina is off School Street in Pawtucket.

3. Although complainant testified that she was trying to awaken defendant's mother, she acknowledged that she did not yell or scream as she passed beneath Mrs. Dennis's kitchen window, which was on the first floor of the house.

There is conflicting testimony as to who unlocked the door to complainant's apartment; it is undisputed, however, that both of them entered the apartment and that, once inside, each drank a beer from the six-pack that defendant had purchased. According to the testimony of complainant, she then told defendant that she did not want anything to happen between them and that he should go home. She said that defendant told her to take her clothes off and that, when she did not do so, he unzipped her jeans, which fell to the floor, and that he then pulled on one side of her underwear causing them to fall off. She testified that she then went into her bedroom to get away from defendant and that defendant pushed her face down on her bed and proceeded to penetrate her vaginally from behind. The complainant testified that she was crying throughout the intercourse and that she told defendant "no" repeatedly.

The defendant testified that, when they entered complainant's apartment, she was talking about some makeup that had broken when he dropped her pocketbook out of the window of his truck as they were leaving Parens Marina. He further testified that he apologized about the makeup and offered to buy complainant some new makeup; he said that he then reached out for her, tearing her shirt a little. He proceeded to testify that complainant went in and out of the bathroom several times, eventually emerging from the bathroom wearing only her top.[4] He further testified that she then sat on the end of her bed with her legs open while staring at him seductively. (It is clear from the record that, although he was in the kitchen at that point in time, defendant was able to see into the bedroom.) The defendant then left the kitchen and entered the bed-room—where, according to his testimony, he and complainant began to kiss each other. The defendant stated that they then engaged in consensual sexual intercourse, during which complainant neither resisted nor cried. The defendant also testified that complainant never told him to stop and that she responded to what was happening, if at all, with a groan.

It is undisputed that, after that first sexual act was completed, complainant got out of bed and went into the bathroom. She testified that, while in the bathroom, she put on a nightgown or T-shirt. The defendant testified that, when she returned from the bathroom, complainant went into the kitchen, took a beer out of the refrigerator and returned to the bedroom. The complainant denied that she ever left the bedroom to get a beer.

According to the testimony of complainant, defendant then fell asleep on her bed for a few hours even though she attempted to wake him up by bouncing on or shaking the bed. (The defendant quite similarly testified that complainant was bouncing on the bed in order to wake him.) The complainant further testified that she was afraid to leave the apartment or call the police while defendant was asleep because she was afraid of what he might do if he awoke and caught her. The complainant also testified that, after her efforts to awaken defendant proved unsuccessful, she fell asleep on her daughter's twin bed, which was adjacent to her own bed in the same room.

The complainant testified that, at approximately 3 a.m., she awoke to find defendant standing at the side of the bed, indicating that he wanted to have sexual relations with her again. The complainant testified that she told defendant no, but

---

4. The defendant's trial testimony about this part of the evening differs in several material respects from the videotaped statement that he gave to the police at the police station.

that he told her that she was going to have to participate anyway. The complainant further testified that she then got up and moved towards the kitchen, at which point defendant put a pillow over her face and pushed her back onto her own bed. The complainant stated that defendant then removed the pillow and once again had sexual intercourse with her.

The defendant's version of the morning's events differs markedly from the account given by complainant. According to defendant's testimony, when he finally fell asleep following the first sexual encounter, complainant was across the room from him on her daughter's bed, but when he awoke she was lying beside him in her own bed. The defendant testified further that, when he awoke, he touched complainant, who was next to him in the bed, in an effort to arouse her sexually, at which point she got up and stood beside the bed. He stated that he then also got out of bed and that they stood next to each other and caressed each other and then engaged in consensual sexual intercourse.

The complainant testified that, after the second sexual act, defendant told her that he wanted to marry her. Both parties testified that defendant got up from the bed and went to the kitchen to make himself a lunch from food in complainant's refrigerator to bring to work. The complainant testified that, after making his lunch, defendant returned to the bedroom, kissed her on the forehead and told her that he loved her but had a funny way of showing it. In contrast, defendant testified that it was complainant who stated

that defendant had a funny way of showing it.

After defendant left the apartment, complainant telephoned her sister and arranged to pick up her daughter. The complainant testified that during that phone call she did not mention anything to her sister about what had happened, because at that point she was not sure whether or not she would go to the police to complain.[5] Once she arrived at her sister's house and saw her daughter, however, she broke down and told her sister what had happened. The complainant testified that at that point she went with her sister to the Pawtucket·police station, where she briefly recounted the events of the previous several hours to Officer David Kelly. After speaking with Officer Kelly, she was taken to the office of Detective Gary Grenier, who was called in along with Patrolman Doran[6] and Detective Gonsalves, so that a detailed statement could be taken.

After the detectives took complainant's statement, Detectives Grenier and Gonsalves, along with Detective Mark Force, accompanied her back to her apartment so that they could process the scene where the alleged incidents of sexual assault took place. They made arrangements to have complainant's sister meet them at the apartment so that she could take complainant to the hospital to be examined. Detective Grenier testified that, when they arrived at the apartment, complainant received a telephone call and indicated to the detectives that the caller was defendant. The detectives instructed complainant to invite him to come to her apartment to talk, which she did.[7] Detective Grenier

5. The complainant's sister testified that, although she believed that complainant did call her house on the morning of August 26, 2000, she did not speak to her sister at that time. She speculated that someone else at her house must have answered the phone.

6. The record indicates that Patrolman Doran has since become a detective in the Pawtucket Police Department.

7. The defendant testified that, when he first called complainant on August 26, she told him to go home. He also testified that it was he who had wanted to go to her apartment.

further testified that, at some point thereafter, complainant received a second phone call, also from defendant, and that the police again instructed her to invite him to the apartment. The complainant again complied with the instruction.

After receiving these two phone calls, complainant left the apartment to go to the hospital, and the police stayed behind. Detective Grenier testified that he and Detective Force stayed inside the apartment while Detective Gonsalves took up a surveillance position to the west of the apartment building so that, on the basis of complainant's description of defendant's vehicle, he could watch for defendant's arrival. Detective Grenier testified that, approximately forty minutes later, Detective Gonsalves notified him by radio that a vehicle matching the description given by complainant had pulled up on the street in front of the apartment. Detective Grenier further testified that, upon receiving the call from Detective Gonsalves, he looked out the window of the apartment and saw a man who he believed to be defendant exiting the vehicle.

The facts as to what happened next are largely disputed. Detective Grenier testified that, when defendant knocked on the outside door to the apartment, he answered the door, went outside and turned defendant around so that his hands were on the railing of the stairs. He then proceeded to do a pat-down search to determine whether defendant was carrying any weapons. Detective Grenier further testified that he then advised defendant that he was being taken into custody and would be brought to the Pawtucket police station, where the police would give him further information about the reason for his having been taken into custody. According to

Detective Grenier, defendant said nothing in response.[8] At that point, Detective Grenier handcuffed defendant and called for a patrol unit to come and drive him to the police station.

The defendant testified that, when he pulled up in front of complainant's apartment and knocked on the door, there was no answer. He stated that he then returned to his truck and opened the door to get in, at which time a small station wagon pulled in front of the truck and the driver asked for directions. He further testified that, as he was giving the directions, the driver of the station wagon asked him whether he was Brian Dennis—and, when defendant responded affirmatively, the driver told him that he was under arrest and put handcuffs on him. The defendant testified that the arresting officer, whom he later identified as Detective Gonsalves, neither informed him what the charges were nor read him his *Miranda* rights.[9] The defendant testified that he asked Detective Gonsalves why he was being arrested and that the detective responded, "I think you know."

The defendant testified that Detective Gonsalves then led him into complainant's apartment and sat him down on her couch. He further testified that Detective Grenier then walked out of the apartment and spoke with someone outside, while another officer examined the trash in the kitchen. The defendant testified that he was then taken to the police station by two officers, neither of whom read him his rights or informed him of the charges against him.

According to Detective Grenier's testimony, a patrol vehicle arrived in response to his call and drove defendant back to the

---

**8.** At the hearing on his motion to suppress, Detective Grenier testified that defendant asked why he was being taken into custody.

**9.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

police station. The record indicates that Pawtucket Patrolmen Theroux and Doran were the officers who responded and who drove defendant to the station. Detective Grenier testified that he and Detective Force stayed behind at the apartment to finish processing the scene and to secure the apartment before returning to the police station. Patrolman Theroux testified that, upon arriving at the police station, defendant was processed, fingerprinted, photographed, and searched before being placed in a holding cell. Patrolman Theroux also testified that defendant made no statements during that period of time.

The defendant testified that he was not informed of the charges against him nor was he read his rights when he arrived at the station. He testified that, after being processed, he informed the officers that he had a guardian.[10] After processing defendant, Detectives Grenier and Gonsalves took defendant from his cell to another room for interviewing.

According to Detective Grenier, the detectives brought defendant to an interview room and reviewed with him the preprinted form setting forth his *Miranda* rights. Detective Grenier further testified that, when the defendant confirmed that he understood his rights, the detectives asked him to fill in his name and to initial the

form in the appropriate places, which he did. Detective Grenier also testified that defendant neither made any statements nor asked any questions while the form was being reviewed—but that, after being advised of his rights, defendant agreed to make a statement. Detective Grenier testified that they then spoke with defendant for a short time [11] before deciding to videotape the statement.

The defendant testified that, after Detective Grenier and Detective Gonsalves brought him from the cell to the interview room, they asked him what had taken place. He said that he responded to that question by giving a brief description of the events leading up to his arrest. He further testified that, after hearing his description of those events, the detectives stated, "We almost believe you." The defendant testified that his rights were not read to him until the detectives turned on the video camera. In his videotaped statement, defendant's version of the events was largely consistent with what the complainant herself had told the police—the very significant difference being that defendant claimed that each of the two acts of sexual intercourse between complainant and him had been consensual.

At the pretrial suppression hearing on May 30, 2002,[12] at which defendant testi-

10. The trial justice barred any further testimony related to the guardianship issue. The defendant had testified at the hearing on his motion to suppress the videotaped statement that he informed the officers who processed him that he had a guardian and that they responded by telling him that he was too old to have a guardian.

11. Detective Grenier testified at the hearing on defendant's motion to suppress that defendant was given his *Miranda* warnings "ten to fifteen minutes, if that" before the videotaping began. Regrettably, the waiver of rights form that defendant signed, which might well have indicated the precise time that the *Miranda*

warnings were given, was lost at some time before the suppression hearing.

12. Several months prior to the suppression hearing, beginning on January 23, 2001, there had been a probation violation hearing. At the time of the incidents relevant to this case, defendant was on probation for a prior unrelated offense. The hearing justice at the probation violation hearing found that defendant had violated the terms and conditions of his probation. Even though he found a probation violation, the hearing justice chose to revoke the suspended sentence that had been imposed with respect to the underlying charge and chose instead to impose a two-year sentence for the violation. The hearing

fied, it was the contention of the defense that the videotaped statement taken by the Pawtucket police should not be admitted into evidence because it had been given involuntarily. The defendant's contention that the statement was involuntary was based upon: (1) his limited mental capacity due to a brain injury he suffered in his late teens; (2) his status as a person under guardianship as a result of that injury; (3) his testimony at the suppression hearing that he informed the police of his guardianship status and that they mocked him because of it; (4) his testimony that he was interrogated by the police while in custody but prior to being given *Miranda* warnings; and (5) his testimony that he agreed to give the videotaped statement because the police had told him "we almost believe you." (The giving of such an assurance by the police, defendant contends, constituted the use of an improper interrogation technique.)

At the suppression hearing, after hearing the testimony of the witnesses and the arguments of counsel, the trial justice denied defendant's motion to suppress the videotaped statement. At the outset of his decision on that issue, the trial justice noted that he did not give great weight to the "pronouncement on [defendant's] guardianship for mental illness." In addition, the trial justice found that "the defendant was not afforded his rights in anything other than a satisfactory manner." It appears from the record (although it is nowhere explicitly stated) that the trial justice also found that there had been no interrogation of defendant before he was presented with the waiver of rights form.

At the trial, in response to a question asked on direct examination about what occurred at the Pawtucket police station,

justice then credited defendant for time served and suspended the balance of that two-

defendant testified that he had told the police: "I have a guardian." The prosecutor immediately objected and requested a sidebar conference, during which the trial justice stated for the record that he had ruled in a chambers conference that he would not allow the jury to hear any testimony or consider other evidence relative to defendant's guardianship status. More specifically, the trial justice stated:

"[I]n that chamber's [*sic*] conference the court gave an advisement to defense counsel that based on the hearing of the suppression issue * * * and the court's findings that the defendant made a knowing, willing, and intelligent waiver of his rights that there would be no mention by any witness * * * with regard to whether or not this defendant had a guardian. Now, the court believes that that adjudication precludes any mention of him by this [*sic*] because there is a rehash of now [*sic*] this whole *Miranda* situation which the court already ruled on. * * * [T]here will not be any instructions to this court regarding *Miranda* rights to this jury. I already made a legal determination that his rights were covered adequately * * *."

The trial justice then struck from the record defendant's statement about having a guardian, and he instructed the jury to disregard it.

Later, after both parties had rested, the trial justice charged the jury, but he did not give an instruction concerning the jury's role with respect to determining the voluntariness *vel non* of defendant's videotaped statement. Counsel for defendant did not object on the record concerning the lack of a jury instruction relative to the

year sentence.

jury's duty to determine the voluntariness of defendant's videotaped statement.

After the jury found him guilty of the first count of first-degree sexual assault,[13] defendant filed a motion for a new trial. That motion was denied on June 21, 2002, and defendant was then sentenced to thirty years of imprisonment at the Adult Correctional Institutions, with seventeen years to serve and the remainder suspended, with probation. The .defendant timely appealed.

On appeal, defendant argues that the trial justice's failure to give an instruction to the jury concerning its role in determining the voluntariness of defendant's videotaped statement constituted a violation of Rhode Island's Humane Practice Rule,[14] and defendant contends that that failure was reversible error. The state counters that, because defendant did not object on the record to the lack of a jury instruction about voluntariness, he is precluded from raising the issue on appeal. The defendant further argues that the trial justice's exclusion of certain evidence bearing on the voluntariness of defendant's videotaped statement[15] was also a violation of his rights under the Humane Practice Rule and also constitutes reversible error.

The defendant contends that his failure to object to the lack of a jury instruction about the voluntariness of his videotaped statement to the police should not be fatal to his appeal with respect to that issue. He argues that, in addition to the important fact that the trial justice explicitly told counsel on the record that the jury would not be instructed as to *Miranda* rights, the trial justice also explicitly declined to admit for consideration by the jury certain evidence relevant to the issue of the voluntariness of defendant's statement. Because of those adverse evidentiary rulings, defendant argues, there would have been insufficient substantive evidence in the record for the jury to weigh even if an instruction about voluntariness had been given. In other words, defendant argues that, once the judge decided to exclude the evidence, an instruction about the jury's role in determining voluntariness would have been ineffectual.

The defendant also argues on appeal that the trial justice, in conducting his own assessment of voluntariness, erred in ruling that the state met its burden of proving that defendant' gave his statement voluntarily because the trial justice did not first consider the totality of the circumstances in which defendant waived his rights and proceeded to give the statement.

In addition, defendant contends that there is sufficient evidence in the record to demonstrate that the police interrogated him before he received *Miranda* warnings and that, therefore, pursuant to the United States Supreme Court's recent decision in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), his waiver was involuntary. The state disagrees, arguing that the evidence in the record supports the trial justice's determination that

---

13. It will be recalled that, with respect to the second count of first-degree sexual assault (which related to the act of sexual intercourse that took place in the complainant's apartment a few hours after the first sexual act between these two persons in that same location), the jury found defendant not guilty. It will further be recalled that the jury also found defendant not guilty of the kidnapping charge.

14. The "Humane Practice Rule" is defined and discussed later in this opinion.

15. According to defendant, the most potentially probative pieces of excluded evidence would have been testimony about his guardianship status and testimony about statements allegedly made to him by the police during a pre-*Miranda* interrogation.

defendant was informed of his rights in a constitutionally satisfactory manner.

The defendant also argues that the trial justice erred in prohibiting defense counsel from impeaching complainant with evidence that she had lied on a prior occasion about having been raped. (The complainant's prior admittedly false claim of rape did not involve the instant defendant, but rather another man.) The state contends that the trial justice properly excluded that evidence due to the fact that complainant did not make that false claim to the police or to any other authority.

The defendant further contends that the trial justice improperly excluded evidence relating to certain specific aspects of the consensual sexual relationship between complainant and him during the months preceding the time of the incidents at issue here and that, by so excluding that evidence, the trial justice impermissibly interfered with his right to testify on his own behalf. The state argues that the trial justice properly limited the scope of the evidence concerning the nature of the consensual relationship between complainant and defendant.

### Standard of Review

■ When reviewing a trial justice's decision to deny a criminal defendant's motion to suppress a confession, we give deference to the trial justice's findings of fact, reversing only when those findings were "clearly erroneous." *State v. Page,*

709 A.2d 1042, 1044 (R.I.1998). However, the ultimate question of whether a confession was given voluntarily is legal in nature, and "this Court undertakes a *de novo* review of questions of law and mixed questions of law and fact insofar as those issues involve constitutional issues." *Id.* (citing *State v. Nardolillo,* 698 A.2d 195 (R.I.1997) and *State v. Campbell,* 691 A.2d 564 (R.I. 1997)). For a defendant's confession to be admissible against him or her, the state must first prove by clear and convincing evidence that the defendant's *Miranda* rights were knowingly, voluntarily and intelligently waived. *Page,* 709 A.2d at 1044.

■ The rules contained in Article IV of the Rhode Island Rules of Evidence, although not explicitly cited by the trial justice in the present case, empower trial justices to exclude certain evidence. Our review of the trial justice's rulings of law with respect to the admission or exclusion of evidence is limited to determining whether the trial justice abused his discretion.[16]

### Analysis

### I

### The Humane Practice Rule

■ When a criminal defendant challenges the voluntariness of his or her statements to the police, the courts of Rhode Island evaluate the challenge pursuant to what has long been called the Humane Practice Rule.[17] *See, e.g., State v.*

**16.** Of course, if it were alleged that the admission or exclusion of evidence were so complete as to violate a defendant's constitutional right to confrontation, we would review the trial justice's ruling in a *de novo* manner. *See State v. Oliveira,* 882 A.2d 1097, 1122 (R.I. 2005) (*"In situations in which the trial justice does not totally prevent or completely prohibit* the defendant from exploring the issues of motive, bias, or prejudice of the witness, we

employ an abuse-of-discretion standard on review.") (emphasis added).

**17.** Rhode Island has adhered to the Humane Practice Rule, a quite remarkable supplementary protection for defendants, since at least the time of this Court's decision in the case of *State v. Mariano,* 37 R.I. 168, 186–87, 91 A. 21, 29 (1914). *See State v. Killay,* 430 A.2d 418, 421 n. 2 (R.I.1981). The title given to this rule appears to have been derived from the opinion of Chief Justice Morton in the

*Tassone,* 749 A.2d 1112, 1117–18 (R.I. 2000).

■ The Humane Practice Rule requires that a trial justice in this jurisdiction, before allowing the admission of a defendant's inculpatory statement or confession into evidence, must make a preliminary determination that the statement or confession was made voluntarily. *Id.* at 1118; *see also State v. Killay,* 430 A.2d 418, 421 (R.I.1981). In further accordance with the Humane Practice Rule, if the trial justice is persuaded by clear and convincing evidence that the statement was voluntary, he or she then must, *as an additional safeguard,* give a specific instruction to the jury that it may consider the statement as substantive evidence only if it first finds that the statement was made voluntarily. *State v. Lima,* 546 A.2d 770, 773 (R.I.1988) ("[T]he trial justice * * * must specifically instruct the jury that before it may consider the evidence substantively it must determine that the inculpatory statement was not obtained in violation of the defendant's constitutional guarantees."); *see also Tassone,* 749 A.2d at 1118.

■ In other words, the Humane Practice Rule requires that judge and jury make separate and independent determinations of voluntariness—and the defendant's statement may not serve as a basis for conviction unless **both** judge and jury determine that it was voluntarily made. *See, e.g., Tassone,* 749 A.2d at 1118; *Lima,* 546 A.2d at 773. With respect to the

voluntariness determinations that are to be made separately by the trial judge and the jury, the burden of proof that is imposed upon the state is that of "clear and convincing evidence." *Lima,* 546 A.2d at 773 n. 3.

In the present case, after a preliminary hearing outside the presence of the jury, the trial justice implicitly found that defendant had been given his *Miranda* rights before being questioned and that he had voluntarily waived those rights and had voluntarily given a videotaped statement to the police.[18] As the trial came to an end and both parties had rested, the trial justice instructed the jury. Very significantly, however, he did not instruct the jury that it must first determine whether defendant's videotaped statement was made voluntarily before it could consider the statement as substantive evidence.

■ We are well aware of the fact that Rule 30 of the Superior Court Rules of Criminal Procedure requires that, in order to preserve the issue for appeal, a defendant must articulate an objection to the giving or omission of a particular jury instruction before the jury is excused to consider its verdict and must state with specificity the grounds for that objection.[19] *See State v. Brown,* 744 A.2d 831, 837 (R.I.2000); *see also State v. Hanes,* 783 A.2d 920, 924 (R.I.2001); *State v. Pailin,* 114 R.I. 725, 730, 339 A.2d 253, 256 (1975) (rejecting defendant's contention that the trial justice committed reversible error by

Massachusetts case of *Commonwealth v. Preece,* 140 Mass. 276, 5 N.E. 494, 495 (1885) (a case that this Court cited in *Mariano*).

**18.** We will address in section III of this opinion the issue of whether the trial justice, in making his own determination as to the voluntariness of defendant's videotaped statement, sufficiently examined the totality of the circumstances surrounding defendant's making of that statement.

**19.** Rule 30 of the Superior Court Rules of Criminal Procedure states in relevant part: "No party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection." See generally *State v. Pacheco,* 763 A.2d 971, 979 (R.I.2001).

failing to charge the jury with the duty of determining the voluntariness of defendant's statement, since defendant never requested such an instruction).[20]

It is our opinion, however, that there are circumstances peculiar to the present case which justify our consideration of defendant's Humane Practice Rule argument notwithstanding his failure to have raised that issue immediately after the jury was instructed. As we have indicated, during the trial, defendant testified on direct examination that, on the day of his arrest, after being fingerprinted and photographed at the police station, he informed the police that he had a guardian. The prosecutor objected and requested a sidebar conference, during which the trial justice stated for the record that, in a chambers conference, he had indicated to counsel that no witness was to mention whether or not defendant had a guardian. The trial justice did not limit himself to summarizing his view as to the admissibility of the evidence relative to the guardianship issue; rather, he chose to make a broader statement to the effect that "this whole Miranda situation" had been ruled on. Specifically, the trial justice stated:

"[I]n that chamber's [sic] conference the court gave an advisement to defense counsel that based on the hearing of the suppression issue * * * and the court's finding that the defendant made a know-ing, willing, and intelligent waiver of his rights that there would be no mention by any witness * * * with regard to whether or not this defendant had a guardian. Now, the court believes that that adjudication precludes any mention of him by this [sic] because there is a rehash of now [sic] this whole Miranda situation which the court already ruled on. * * * [T]here will not be any instructions to [sic] this court regarding Miranda rights to this jury. I already made a legal determination that his rights were covered adequately * * *."

 Unquestionably, the trial justice was within his discretion in according little or no weight to the evidence relating to defendant's guardianship status when making his own determination that defendant's statement was voluntary; however, under our law, he was not permitted to stop there. Pursuant to the Humane Practice Rule, the trial justice was required to instruct the jury that *the jury had an affirmative duty to make its own independent determination* as to the voluntariness of the videotaped statement, and he was accordingly required to give the jury the opportunity to weigh the admissible evidence relative to the facts and circumstances bearing on that issue.[21] However, instead of instructing the jury to that effect in accordance with the Humane Practice Rule, the trial justice not only

---

**20.** What distinguishes the instant case from cases such as *State v. Pailin*, 114 R.I. 725, 730, 339 A.2d 253, 256 (1975), where the right to an instruction on voluntariness was deemed to have been waived, is the fact that the trial justice in the case at bar stated in no uncertain terms that "there will not be any instructions * * * regarding Miranda rights to this jury." While defense counsel in the instant case (notwithstanding the quite definitive statement by the trial justice) should have requested such an instruction at the time of jury instructions and should have objected on the record when such an instruction was not given, in the context of this record we decline to hold that defendant has waived his argument based on the Humane Practice Rule.

**21.** This principle is akin to the principle that a trial judge may not direct a verdict in favor of the prosecution in a criminal case. *See State v. Ensey*, 881 A.2d 81, 96 (R.I.2005); *see also Sullivan v. Louisiana*, 508 U.S. 275, 277, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) ("The right [to trial by jury] includes, of course, as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of 'guilty.' ").

stated that he had found that "the defendant made a knowing, willing, and intelligent waiver of his rights," but he also went on to say very definitively that he would not instruct the jury as to voluntariness. His exact words were: "[T]here will not be any instructions * * * regarding Miranda rights to this jury."

It is clear to us that the Humane Practice Rule was not adhered to in the instant case and that, therefore, defendant's conviction must be vacated and the case remanded for retrial. We have chosen to disregard, in this close case, defendant's regrettable failure to have objected to the omission of a jury instruction on voluntariness; we have done so because of the trial justice's explicit statement that he would not give "any instructions * * * regarding Miranda rights to this jury."

Although the trial court's failure to have adhered to the Humane Practice Rule constitutes a more than sufficient basis for the vacation of defendant's conviction, we shall now proceed to comment upon certain other arguments advanced by defendant—since the issues implicated by those arguments are likely to present themselves once again at a retrial of this case.

## II

### The Exclusion of Certain Evidence Bearing on Voluntariness

 It is further our opinion that the trial justice erred in excluding certain evidence relative to the voluntariness issue in light of the strictures of the Humane Practice Rule. Specifically, the trial justice abused his discretion by excluding testimony regarding a statement that defendant said the police made to him just before he executed the waiver of rights form; he alleges that this purported statement by the police influenced his decision to give a videotaped statement. During the trial,

defense counsel asked Detective Grenier on cross-examination whether he told defendant during a pre-videotape interrogation that he "almost believed" him. The state objected to this question, and the trial justice sustained the objection stating at a sidebar conference with counsel:

"That line of questioning is forbidden by *Harnois*. If any of those statements were made that the defendant could testify or is required to testify to through them personally not through this witness."

It is our view that *State v. Harnois*, 638 A.2d 532 (R.I.1994), the case referred to by the trial justice, is inapposite to the situation presented here. In *Harnois*, this Court held that a non-testifying defendant could not introduce *his own* statements through the testimony of investigating officers or through other police records. *Id.* at 535–36. In the present case, by contrast, defendant, sought to give greater credence to the testimony that he planned to give by asking the detectives themselves about a statement that he says they made to him. The defendant argues that the detectives' statement to him that they "almost believe[d]" him indicates that they were employing an improper interrogation technique, the use of which he contends rendered his waiver ineffectual and his statement involuntary. Without commenting on his theory, it is our view that defendant should have been permitted to attempt to elicit this testimony from the detectives, since it might have had a bearing on the jury's assessment of voluntariness.

 It is also our opinion that the trial justice erred by excluding from consideration by the jury evidence pertaining to defendant's alleged guardianship status. Although the trial justice was surely within his discretion in ascribing little weight to defendant's guardianship status in making

his own decision on the issue of voluntariness, defendant's guardianship status was one of the circumstances surrounding his interrogation that *the jury* would have had to consider if it had been given the opportunity to make a voluntariness determination, as it should have.[22] By excluding from the jury testimony about defendant's guardianship status, the trial justice kept from the jury the full context of defendant's interrogation and attendant videotaped statement. We hasten to add that the relevancy of the defendant's guardianship status has a temporal aspect: the issue to be determined at trial would be defendant's current status and not what occurred many years ago. It is incumbent upon the defense to produce evidence of defendant's guardianship status at the time of this incident.

## III

### The Trial Justice's Ruling as to the Voluntariness of Defendant's Statement

 The defendant asserts that the trial justice failed to consider the totality of the circumstances surrounding defendant's interrogation by the Pawtucket police when making *his own determination* that the statement was given voluntarily—a failure that the defendant contends was error. In determining whether a statement was made voluntarily, the trial justice must consider the totality of the facts and circumstances related to the giving of that statement. *State v. Marini,* 638 A.2d 507, 512 (R.I.1994) ("When reviewing the voluntariness of a confession, all facts and circumstances surrounding the confession

must be taken into account in determining whether, overall, the confession was freely and voluntarily made.").

Specifically, defendant cites as error the trial justice's failure to make factual findings concerning the following disputed issues of fact: (1) whether defendant advised the police that he had a guardian; (2) whether defendant was questioned prior to being given *Miranda* rights; (3) whether the detectives told defendant that they "almost believed" him; and (4) whether defendant understood and voluntarily waived his rights.

 It is well settled that we review the determination of a trial justice concerning the voluntariness of a statement in a *de novo* manner. *State v. Ramsey,* 844 A.2d 715, 720 (R.I.2004). Although the record in the instant case contains only a relatively small amount of express fact-finding relative to the trial justice's legal conclusion that defendant voluntarily agreed to make the videotaped statement, we have concluded that the fact-finding in that respect was sufficient to permit us to review the legal conclusion.

Given the trial justice's express and implied fact-finding, which we have determined not to be clearly erroneous, *see Ornelas v. United States,* 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *see also State v. Verrecchia,* 880 A.2d 89, 95 (R.I.2005), we hold that the trial justice did not err when he ruled that the state had borne its burden of proving by clear and convincing evidence that the videotaped statement was voluntarily made.

---

**22.** Rule 401 of the Rhode Island Rules of Evidence defines relevant evidence in rather liberal terms, and it is our judgment that defendant's guardianship evidence was admissible under that rule.

Rule 401 reads as follows:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

## IV

## The Prior False Claim Issue

The defendant also argues that, by prohibiting the defense from impeaching complainant with evidence of a prior false claim of sexual assault made by her, the trial justice erroneously excluded evidence that was directly relevant to the issue of her credibility—thereby depriving him of the right to cross-examine her adequately.[23] It is a given in our system of justice that "[t]he right to cross-examine adverse witnesses provides the defendant with an opportunity to test the credibility and veracity of the witnesses' testimony."[24] *State v. Dorsey*, 783 A.2d 947, 950 (R.I.2001); *see generally Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Moreover, evidence that a witness previously made a similar claim of wrongdoing against one or more other persons may be admissible to challenge that witness's credibility—even if that claim was never proved false. *See Dorsey*, 783 A.2d at 951 ("[E]vidence of a complaining witness's similar accusations of wrongdoing against others may be used to challenge a witness's credibility with respect to the pending charges, regardless of whether those prior accusations ever were proved false.").

In the present case, complainant herself admitted (at defendant's probation violation hearing) that, on a prior occasion, she had lied to defendant and to others by claiming that she had been raped (in another state by another man). In our view, this prior false claim of rape is relevant because of the similarity between the two alleged acts (rape in each instance) and the fact that complainant had admitted that the earlier accusation was a lie. Therefore, it is our view that this evidence was directly relevant to defendant's effort to discredit complainant's credibility and that it was an abuse of discretion to have excluded it.

We perceive no basis in the law for the state's contention that Rhode Island law requires that similar false claims by a witness about past wrongdoing must have been made to the police or to some other authority in order to be admitted for purposes of impeachment. In *State v. Izzi*, 115 R.I. 487, 348 A.2d 371 (1975), this Court reversed a defendant's conviction in an assault and battery case and held that the trial justice had improperly excluded the testimony of three witnesses who were prepared to testify that the complainant had repeatedly made similar unfounded false accusations of assault and battery to coworkers. The defendant in that case was an attendant at a mental health institution at which the complainant was a resident patient, and the three witnesses whose testimony was excluded were also attendants at the facility. *Id.* at 488, 348 A.2d at 371–72. In spite of the fact that the testimony did not involve charges made to police officers or other authority figures, this Court held that the evidence was erroneously excluded and that the defendant was prejudiced by that exclusion.

In *Izzi*, this Court likened the assault and battery allegations at issue in that

---

**23.** A defendant's right to confront and to cross-examine a testifying adverse witness is guaranteed by the Sixth Amendment to the United States Constitution and by article 1, section 10, of the Rhode Island Constitution.

**24.** The right to confront and cross-examine adverse witnesses is not without limits, however, and our review of the limitations that a trial justice has placed on cross-examination is limited to determining whether there was an abuse of discretion in the imposition of such limitations. *See State v. Dorsey*, 783 A.2d 947, 950 (R.I.2001) ("This right * * * is not unlimited, and it may be circumscribed within reasonable parameters of relevance in the exercise of the trial justice's discretion.").

case to the prosecution of sex offenses and noted that in such cases the legal propriety of admitting evidence of similar false accusations lies, *inter alia*, in the fact that "guilt or innocence often turns on the relative credibility of the prosecutrix and the accused" especially in the absence of eyewitnesses. *Izzi*, 115 R.I. at 490, 348 A.2d at 372, 373. The complainant admitted at defendant's probation violation hearing that she lied to defendant and told him that she had been raped when she actually had not been. She testified as follows:

"Something did happen with that person, and I lied about the rape part of it because I, I liked [defendant] a lot and I didn't want him to think lower of me or something."

As the state acknowledges in its brief to this Court, complainant also testified that defendant was not the only person she ever told about the incident, although she could not remember the names of the other people she told. Credibility was of enormous importance in the instant case, in which there were no eyewitnesses. The complainant's testimony that she had on a prior occasion falsely told defendant and others that she had been raped was certainly relevant to the crucial issue of her credibility and might well have had a substantial impact upon the members of the jury. Consequently, we are of the opinion that the trial justice abused his discretion in not allowing the complainant to be cross-examined about this subject.

### Conclusion

For the reasons set forth in this opinion, the defendant's appeal is sustained, his conviction is vacated, and the case is remanded to the Superior Court for retrial. The record may be returned to that court.