STATE

v.

**Kimberly ST. MICHEL.**

**No. 2010–121–C.A.**

Supreme Court of Rhode Island.

March 6, 2012.

Virginia M. McGinn, Department of Attorney General, Providence, for State.

Catherine Gibran, Office of the Public Defender, Providence, for Defendant.

Present: SUTTELL, C.J.,
GOLDBERG, FLAHERTY, and
ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

The defendant, Kimberly St. Michel, appeals from a Superior Court judgment of conviction for embezzlement of funds in excess of $100. At the time of the offense, the defendant was employed as a bookkeeper for Mount Pleasant Hardware, a business at which she had worked for nearly a decade. Except for a downturn in business, all appeared to be in order at the small, family-owned business until its owner, Marc Gillson, stumbled upon some discrepancies in the store's financial records that suggested to him that a significant amount of money was missing. After reviewing his store's books, Mr. Gillson discovered, much to his chagrin, that someone had apparently misappropriated nearly $66,000 and manipulated the store's

records in an attempt to conceal the theft. The shadow of suspicion inevitably fell upon the defendant; she was primarily responsible for the store's financial records, she had daily access to all of the store's funds, she never had reported any discrepancies to Mr. Gillson or any other employee, and she had no explanation either for the missing money or the improper documentation of hundreds of transactions.

On December 29, 2006, a criminal information charged defendant with one count of embezzlement of funds over $100. In April 2009, the matter proceeded to a jury trial in the Providence County Superior Court, but the trial ended in a deadlocked jury. After a retrial in October 2009, a jury convicted defendant of embezzlement. The trial justice sentenced her to fifteen years imprisonment at the Adult Correctional Institutions, with one year to serve and fourteen years suspended, with probation and restitution.[1] The defendant timely appealed her conviction to this Court.[2] For the reasons set forth in this opinion, we affirm the judgment of conviction.

## I

### Facts & Travel

Marc Gillson and his wife, Antoinette, own and operate Mount Pleasant Hardware, which is on Academy Avenue in Providence. The couple purchased the store from Mr. Gillson's parents, who opened the business in 1923. Mr. Gillson testified that he hired defendant in 1998 to

---

1. The trial justice ordered that six months of the one year to serve should be spent in home confinement.

2. The record indicates that defendant filed her notice of appeal before the trial justice signed the judgment of conviction. Thus, defendant appears to have prematurely appealed this matter. However, Article I Rule 4(b)

of the Supreme Court Rules of Appellate Procedure states that "[a] notice of appeal filed after the announcement of a decision, sentence or order but before entry of the judgment or order shall be treated as filed after such entry and on the day thereof." Therefore, defendant's appeal to this Court is, in fact, timely.

be a sales floor cashier. Five years later, he promoted her to the position of book-keeper. Mr. Gillson testified that defendant's primary responsibility was "to keep track of the goings and comings of all of the income that comes in and out of the store." Her daily duties included reconciling the amount of cash, checks, and credit card receipts that were collected each day with the cash register reports; preparing bank deposits; paying bills; keeping a ledger to confirm that checks had cleared and deposits had been correctly credited to the store's account; and balancing the store's checkbook to prevent any inconsistencies and to account for any errors.

It is noteworthy that Mount Pleasant hardware is affiliated with the True Value Company, which provided a computer program to record cash register transactions. Every night, the computer would tabulate and categorize all of the cash, checks, and credit card payments and provide a detailed, hour-by-hour itemized report of all money received and paid out. Each morning, defendant was responsible for reconciling the cash, checks, and credit card receipts on-hand with the amounts found in the register report for the previous day. She then would bundle the cash and checks together in a bank bag and make out a bank deposit slip. Deposits were made every day that the bank was open; funds that were received over the weekend would be deposited on Monday. Mr. Gillson typically made the deposit at the bank, but occasionally Antoinette or a cashier would do it if he was not there.

It was defendant's responsibility to ensure that all of the store's financial paperwork was kept in proper order. The record for a day of sales had four components: a handwritten deposit slip; a bank deposit receipt; a cash register report;

and a handwritten ledger entry. A copy of the handwritten deposit slip prepared by defendant would be attached to the cash register report along with the bank deposit receipt. Each day's deposit was made separately; it was not the practice of the store to aggregate multiple days' sales, even from weekends, into a single deposit. The banking records were stored in boxes that were organized by month. In addition to these papers, defendant kept a handwritten account ledger. Ledger entries included cash deposits, funds received on account, and checks written. It was defendant's responsibility to compare the ledger with the store's monthly bank statements to determine whether each transaction actually had been completed. Mr. Gillson testified that if a handwritten entry had a checkmark next to it, he understood it to mean that defendant had verified the transaction.[3]

The investigation of Mount Pleasant Hardware's financial records that eventually cast a cloud of suspicion on defendant's actions began innocently and, as luck would have it, completely by accident. Mr. Gillson testified that one day, he happened to review the bank receipt after the daily deposit and noticed that there was no cash receipt among the papers from the weekend sales. Wondering whether the cash had been left behind accidentally, he asked defendant if she had any recollection about where the money had gone. He testified that "she couldn't * * * give me any reason why it wouldn't be there." His curiosity was piqued, so Mr. Gillson began looking through the store's most recent sales records. He saw a deposit slip in defendant's handwriting that was stapled to a cash register report for the day in question, but discovered that there was no

---

3. In addition, Mr. Gillson testified that although he occasionally wrote in the ledger, defendant was the employee responsible for verifying the information it contained.

bank receipt confirming that the cash had been deposited. Probing further, he selected a check from the register report and telephoned the customer who wrote it to inquire whether the check ever had been cashed; the customer told him it had. After inquiring of the bank, Mr. Gillson discovered that the check had, in fact, been deposited several days after it should have been, as part of a different transaction, and that the bank never received the hand-written deposit slip that was attached to the store's record. Furthermore, the bank faxed him a copy of the deposit slip for that particular transaction, but there was no matching copy in the store's files.

Mr. Gillson testified that, after making these surprising discoveries, he went on "high alert" and "jump[ed] into all of the boxes of paperwork." He reviewed approximately 400 transactions that had occurred between December 2004 and April 2006 and quickly discovered that the bank receipts that confirmed the deposits had not been properly stapled to hundreds of records.[4] He then painstakingly paired individual bank receipts with the store's financial records by reviewing transactions from the register reports, eliminating in that process about 300 suspicious transactions as merely the result of poor paperwork. However, of the remaining 100 or so transactions, cash was missing and there was no receipt to confirm that the cash had been deposited; other deposits involving checks had been strangely combined. Mr. Gillson testified that he and his wife "toiled" at length with the records because he "couldn't believe it": it was clear to him "that somebody was manipulating the books to take some money."

Furthermore, he concluded that the losses must have been coming from the "back-end," where the bookkeeping was being done, because the ledgers and the register reports reflected the correct amounts.

Still in disbelief, Mr. Gillson turned to his accountant, Anthony Delgrande, and asked him to review his work.[5] After Mr. Delgrande reviewed the same documents as Mr. Gillson, he reached the same conclusion. The pair created a spreadsheet to summarize the allegedly fraudulent transactions, and calculated that the total loss was $65,996.34. Additionally, they discovered that the data reflected a specific and consistent pattern of manipulation: if a deposit included both cash and checks, then the deposit was not made on that day at all. Instead, the checks would show up in a subsequent transaction without being recorded on that transaction's deposit slip, and some or all of the cash would be missing. These suspicious transactions often occurred on days that Mr. Gillson was not at the store. Consequently, Mr. Gillson reported this matter to the police.

## II

### Arguments of the Appellant

Before this Court, defendant advances two arguments. First, she argues that the trial justice erred when he prevented defense counsel from eliciting defendant's out-of-court statement that "she didn't do any of this" through the testimony of Mr. Gillson. She asserts that the statement was not hearsay because it was not offered for the truth of the matter asserted, but rather to impeach Mr. Gillson's prior testimony that she "had no explanation" for the missing funds or the suspicious deposit

---

4. Mr. Gillson testified that he began giving the records close scrutiny starting in December 2004 because, based on his investigation, prior to that time all of the records were properly documented with deposit slips, register reports, and bank receipts.

5. Mr. Delgrande acknowledged in his testimony that he was a certified public accountant specializing in "general accounting," and not a forensic accountant specializing in the detection of fraud.

slips. Second, she contends that the trial justice erred when he denied defendant's motion for a new trial because he overlooked or misconceived material evidence and because the jury verdict failed to do substantial justice.

## III

### Standard of Review

In our review of the trial justice's decision to limit defendant's cross-examination of Mr. Gillson, we are guided by this Court's familiar prescription: "We will not disturb a trial justice's evidentiary ruling without first determining that the ruling constitutes a clear abuse of his or her discretion." *State v. Johnson*, 13 A.3d 1064, 1066 (R.I.2011) (citing *State v. McManus*, 990 A.2d 1229, 1234 (R.I.2010); *State v. Reyes*, 984 A.2d 606, 614–15 (R.I. 2009); *Ferrell v. Wall*, 889 A.2d 177, 188 (R.I.2005)). Furthermore, this Court will not disturb the trial justice's ruling unless the abuse of discretion resulted in prejudicial error. *See Reyes*, 984 A.2d at 615 (citing *State v. Gabriau*, 696 A.2d 290, 294 (R.I.1997)); *State v. Wright*, 817 A.2d 600, 610 (R.I.2003) (citing *State v. Tempest*, 651 A.2d 1198, 1212 (R.I.1995)). Our standard of review with respect to defendant's motion for a new trial is similarly familiar, often-repeated, and well-settled: "A trial justice's ruling * * * will not be overturned unless the trial justice was clearly wrong or unless he or she overlooked or misconceived material and relevant evidence that related to a critical issue in the case." *State v. Cerda*, 957 A.2d 382, 386 (R.I.2008) (quoting *State v. Lynch*, 854 A.2d 1022, 1046 (R.I.2004)).

## IV

### Analysis

#### A. Defendant's Cross–Examination of Gillson

The defendant argues that the trial justice improperly truncated her cross-ex-amination of Mr. Gillson by preventing her from "point[ing] out inconsistencies, inaccuracies and misstatements in the testimony of the state's witnesses," a tactic she argues was critical to her defense. On direct examination, the state asked Mr. Gillson several times about what defendant said when he questioned her about the missing money and the incomplete records. Each time, he replied that she could not provide him with an explanation. During cross-examination, defense counsel asked Mr. Gillson, "But isn't it a fact that Ms. St. Michel did explain it by saying that she didn't do any of this?" The state objected, citing *State v. Harnois*, 638 A.2d 532 (R.I. 1994), and arguing that the statement was self-serving hearsay of a non-testifying defendant. Defense counsel responded by arguing that the statement was not hearsay because it was offered not for the truth of the matter asserted, but rather to impeach Mr. Gillson's prior testimony that she had "no explanation." In his ruling on that objection, and relying on this Court's holding in *Harnois*, the trial justice said that defense counsel would be permitted to ask whether defendant had a response to Mr. Gillson's questions about the money and the records, but that she would not be permitted to ask about the substance of that response.

A defendant's right to meaningfully cross-examine the state's witnesses constitutes a vital part of the due process guarantees of the United States and Rhode Island Constitutions. *See State v. Doctor*, 690 A.2d 321, 327 (R.I.1997) (citing *State v. Veluzat*, 578 A.2d 93, 94 (R.I. 1990)). Consequently, a defendant enjoys some latitude on cross-examination, particularly with respect to issues such as bias or impeachment. Nevertheless, "[a] trial justice has wide discretion in ordering the

proof and in limiting the extent of cross-examinations," *Wright*, 817 A.2d at 610, and may establish reasonable boundaries for an examiner's inquiry. *See id.* After reviewing the record and the relevant precedent, we hold that the trial justice did not abuse his discretion when he prevented counsel from eliciting defendant's out-of-court claim of innocence from Mr. Gillson.

We begin by saying that we disagree with defendant's core assertion that her statement was not offered for the truth of the matter asserted. The defendant's attempted impeachment misses the mark because her out-of-court statement does not appear to explain, contradict, or discredit Mr. Gillson's testimony on direct examination. *See, e.g., State v. Kholi*, 672 A.2d 429, 433 (R.I.1996) ("On cross-examination 'questions designed to explain, contradict, or discredit any testimony given by a witness on direct examination, or to test his accuracy, memory, veracity, or credibility' are perfectly permissible.") (quoting *State v. Benevides*, 420 A.2d 65, 69 (R.I.1980)). On the contrary, we agree with the state that Mr. Gillson's testimony that defendant had "no explanation" is not impeached by her declaration that she was innocent. Mr. Gillson did not testify that defendant was silent, and his answer did not appear to mischaracterize her response. Also, defendant's statement would have had its desired effect only if the statement itself were true. *See United States v. Sadler*, 234 F.3d 368, 372–73 (8th Cir.2000) (holding that a defendant's protestation of innocence immediately prior to his confession was inadmissible for the purpose of impeaching the credibility of a police deputy that testified about his confession). The trial justice did not cut off all inquiry, but permitted defense counsel to ask whether defendant had any response. Defense counsel then chose to ask Mr. Gillson re-

peatedly if defendant had any *explanation* for the situation, not whether she had any *response* to his questions. Unsurprisingly, Mr. Gillson testified consistently that she had no explanation for what was happening at the store.

Additionally, the trial justice did not abuse his discretion when he concluded that defendant's statement fell within this Court's holding in *Harnois*. In that case, the defendant sought to introduce out-of-court statements he made to police officers about an alibi through Rule 803(24) of the Rhode Island Rules of Evidence, the so-called "catch-all" exception to the hearsay bar, while simultaneously exercising his Fifth Amendment right not to testify. *See Harnois*, 638 A.2d at 535–536. This Court held:

> "The defendant did not take the stand at trial. He may not testify by other means * * * By choosing to exercise his Fifth Amendment right, defendant waived all rights to testify. * * * The defendant was seeking to offer testimony through his statements, which might raise reasonable doubt in the minds of a jury, yet would deprive the state of the opportunity of cross-examination. The rules of evidence will not be manipulated in this way." *Id.*

In our opinion, the circumstances here are strikingly similar: defendant chose to exercise her Fifth Amendment privilege not to testify, as she was unquestionably entitled to do. This Court is mindful that whether to testify can be a complex, and even vexing, decision for a defendant. As the great American filmmaker and social commentator Elia Kazan once observed about having to testify before the House Un–American Activities Committee, "What's called 'a difficult decision' is a difficult decision because either way you

go there are penalties, right?" [6] Because she decided that she would exercise her right to not testify at trial, defendant must accept as a consequence that she cannot use the state's witnesses as conduits for her own out-of-court statements. *See Harnois*, 638 A.2d at 535–36; *see also State v. Hazard*, 785 A.2d 1111, 1118–19 (R.I.2001) (holding that a state trooper's recitation of the defendant's proclaimed reasons for attempting suicide was not admissible under *Harnois* ); *State v. Bustamante*, 756 A.2d 758, 764 (R.I.2000) (holding that the defendant could not elicit through a testifying police officer his own hearsay statements about why he held a particular state of mind).

## B. Defendant's Motion for a New Trial

The defendant also argues that the trial justice erred when he denied her motion for a new trial because (1) he overlooked inconsistencies in witness testimony, (2) the state's spreadsheet analysis was incomplete or inaccurate, and (3) the state relied on circumstantial evidence to link defendant to the embezzlement. "When passing on a motion for new trial, 'the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence.' " *Cerda*, 957 A.2d at 385 (quoting *State v. Bergevine*, 942 A.2d 974, 981 (R.I.2008)). In performing his independent analysis, "the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *Id.* (quoting *State v. Schloesser*, 940 A.2d 637, 639 (R.I.2007)). "If, after conducting this independent review, the trial

justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *Id.* (quoting *Schloesser*, 940 A.2d at 639). "If, however, the trial justice finds that the state has failed to prove the defendant's guilt beyond a reasonable doubt, a new trial must be ordered." *Id.* (citing *Bergevine*, 942 A.2d at 981; *State v. Pona*, 926 A.2d 592, 615 (R.I.2007)). This Court will not overturn a trial justice's ruling on a motion for a new trial unless he was "clearly wrong" or "overlooked or misconceived material and relevant evidence that related to a critical issue in the case." *Id.* at 386 (quoting *Lynch*, 854 A.2d at 1046).

We are resolute that the trial justice performed the proper analysis and committed neither clear error nor overlooked or misconceived evidence in making his ruling. The trial justice carefully adhered to the appropriate standard, he made a detailed review of the testimony of the three witnesses, the documentary evidence, and the arguments of the parties, passed favorably on the credibility of each witness, and concluded that he agreed with the jury's verdict. The trial justice's thoughtful analysis is further supported by his candor with respect to elements of the case that gave him pause, such as the relatively short time that the jury spent deliberating and what he termed the sometimes "beneficial" inconsistencies in Mount Pleasant Hardware's financial records. Nonetheless, his reasoning was more than adequate. He found that the suggested inconsistencies were not material and that they were to be expected as part of the daily operation of a small business, and that the evidence showed a calculated and focused pattern of theft that would have been impossible for the defendant to overlook absent fraud on her part. According-

6. Victor S. Navasky, *Naming Names* 208 (1980).

ly, the trial justice did not err when he denied the defendant's motion for a new trial.

## V

### Conclusion

For the foregoing reasons, the defendant's judgment of conviction is affirmed.

The papers in this matter are remanded to the Superior Court.

Justice INDEGLIA did not participate.