April 27, 2026

|  |  |
|---|---|
| State | : |
| v. | : |
| Adauris Garcia. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| State | : |
| --- | --- |
| v. | : |
| Adauris Garcia. | : |

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.**  The defendant, Adauris Garcia, was convicted by a jury of second-degree murder, one count of discharging a firearm while committing a crime of violence, and one count of carrying a pistol or revolver without a license or permit.  He was sentenced to twenty-five years' imprisonment for the second-degree-murder conviction, a consecutive mandatory life sentence for the discharge-of-a-firearm conviction, and ten years for the carrying-without-a-license conviction.  On appeal, the defendant submits that the trial justice erred by (1) excluding testimony and (2) denying the defendant's motion for a new trial.  The defendant asks this Court to order a new trial or, in the alternative, to remand the matter for a new hearing on the motion for a new trial.  After careful consideration of the defendant's arguments and a thorough review of the record, we vacate the

- 1 -

order denying the defendant's motion for a new trial and remand the matter for a new hearing on the motion for a new trial.

## I

## Facts and Travel

On December 1, 2021, a grand jury issued an indictment charging defendant with conspiracy to violate the Rhode Island Uniform Controlled Substances Act by agreeing to possess a controlled substance, namely marijuana, in violation of G.L. 1956 § 21-28-4.08 (count one); murder, in violation of G.L. 1956 § 11-23-1 and § 11-23-2 (count two); discharging a firearm during a crime of violence, namely murder, in violation of G.L. 1956 § 11-47-3.2 (count three); and carrying or possessing a pistol or firearm without a license, in violation of § 11-47-8(a) (count four). The state subsequently dismissed count one under Rule 48(a) of the Superior Court Rules of Criminal Procedure. Trial began on March 31, 2023. The state called five witnesses, and defendant presented one witness—himself. The testimony revealed the following.

On April 11, 2021, Yazmin Rivera arranged to purchase marijuana from the decedent, Isaias Bulus (the decedent or Bulus). She testified that she had purchased marijuana from the decedent the day before and that, on April 11 around 8 or 9 p.m., Bulus informed her that he had acquired "new weed" and she responded that she wanted to buy some. The decedent sent a message to Rivera at 8:52 p.m., saying,

- 2 -

"Meet me at 224 Atlantic Ave prov[.]" Rivera testified that she had planned to go but was not feeling well, so her then-boyfriend Devonte Lewis and his friend, defendant, drove from her apartment in Pawtucket to purchase the marijuana from Bulus in Providence. After defendant and Lewis had left, Bulus messaged Rivera, saying, "Jump in[.]" She attempted to convey this message to Lewis, but when she did not get a response, she texted defendant, "He said to get in [his car.]"

When asked whether there was anything she needed to do in order to purchase marijuana from the decedent, Rivera testified that she had to send a picture of her photo identification to Bulus and that she had done so on April 10, 2021. Lewis testified that he had also previously purchased marijuana from the decedent. He indicated that he had lost his I.D. and was therefore unable to purchase from Bulus because he "required that a purchaser produce some sort of identification." Lewis, however, clarified that he was able to purchase from the decedent the previous evening without his I.D. because Rivera had set up the transaction.

Upon arrival at 224 Atlantic Avenue, defendant exited the vehicle and walked to the decedent's car to consummate the transaction. At the time defendant was in possession of a firearm that belonged to Lewis. Lewis testified that defendant was only gone for "[a] couple seconds" before returning to the car and that in that time frame he heard "a little bang" but that "it wasn't like a loud boom like how a gun sounds"; Lewis confirmed that he had heard gunshots before. Lewis further testified

that, when defendant got back in his car, "[h]e had scratches on his face and told me to pull off.  He was kind of shooken up."  The defendant also did not have any marijuana in his possession.  The pair arrived back at Rivera's apartment about twenty or twenty-five minutes later.

According to defendant, he was carrying a gun in a fanny pack that day in order to protect himself from getting robbed and because carrying a gun as a buyer or seller of marijuana is common.  The defendant testified that, upon arrival at 224 Atlantic Avenue, Lewis told him to "get out and get the weed[,]" so he "got out and went inside the [decedent's] car" and sat in the passenger seat.   The defendant was in the car for around sixteen to eighteen seconds.  The defendant testified as to what occurred:

> "Q  * * * Tell me exactly what happened when you got in the car.
>
> "A  So within seconds, as soon [as] I got in the car, I wasn't --I'm not sure if he said anything to me personally, but as soon as me and the victim made eye contact, he lunged at me.  He went for the neck area, the face area.  And at that point that's when the gun was introduced from the fanny pack.
>
> "Q  Did you have the gun out when you entered the car?
>
> "A  No. He didn't know I had a gun.
>
> "Q   And when you say he lunged at you, can you be specific as to what actions he took in those first few seconds?

"A  So if I'm in the passenger seat, he is in the driver seat, as soon as I got in the car we made eye contact, and he just put his whole body on me from my neck area, my face area.  I didn't know what to do besides going for the pistol.

"Q  Did he reach over the console -- the center console?

"A  Yeah. His upper body was over the console.

"* * *

"Q  What was your thought process as he lunged at you and grabbed at your neck and face?

"A  Who is this kid? That's the first thing I thought of. Why would he -- what's he doing?

"Q  Okay. What happened as he was lunging at you and attacking you?

"A  At that moment we was probably scuffling, like, probably three, four, five seconds, then the gun was now introduced.  When he seen that I had a gun, his first reaction was to go for the gun.  So at that point both our hands was on the weapon.  My hand was on it, and he was on it trying to get full control of the gun.

"Q  Are you still in the passenger seat?

"A  I'm still in the passenger seat, he's on the driver seat, lunged over, fighting for the gun.

"Q  And I think you said that at some point you both had -- were tussling over the gun?

"A  Yeah. At one point I would say he was close to having full possession of the gun.  It was almost under my chin area, my face area.  So at that point it was more of, like, a panic attack.  I just tried to do anything to get it away from my face.

- 5 -

So as he's over me, I tried to open the door because the door was closed. So I tried to open the passenger door, and as he -- his weight and my weight were so compacted in this one area, when I opened the door, we flew out the passenger. I flew backwards and his upper torso body flew like that, to the point where his head and back is hanging out the --

"Q When he started to come after you, were you afraid?

"A I was. I was.

"Q Were you very afraid?

"A I was scared for my life. I'm not going to lie. It was abrupt. And I was frantic. I didn't know what to do next.

"Q Did you have a full understanding of what even was happening?

"A I was confused.

"Q And at some point, as you were struggling over the gun, where was it positioned on your face or neck or head?

"A Around my chin area. At one point it was under my chin, and we both had possession of it. So it was just a matter of who overpowered the gun in a certain direction. You know what I'm talking about?

"* * *

"Q And what happened next?

"A As I opened the door, like I said, both our body weight pressed into one area, so the door just slightly opened and made us lunge, because we was leaning against the passenger side.

"Q And then what happened then?

"A As I was flying out the car, like I said, his upper torso fell -- fell over, meaning he was hanging out the passenger side, and as I was jumping out -- or as I fell out the car, that's when the shot was released.

"Q Okay. Did you know that he had been hit?

"A I didn't."

At trial, defendant maintained that he did not remember pulling the trigger and that he did not shoot the gun intentionally. He then testified that "[a]s soon as the shot went off, I ran[,]" returning to Lewis's car telling him to "[h]urry up" and "[p]ull off." He stated that, upon returning to Rivera's apartment, he was "still nervous" and "[e]verything was going so fast." There, he recalled that "Yazmin was the main messenger going back and forth" so he questioned her about the decedent.

During cross-examination, defense counsel attempted to ask Rivera about her conversation with defendant after he and Lewis returned to her apartment following the shooting, to which the state objected. A sidebar commenced, in which the trial justice asked defense counsel what he expected to "extract from her in response to that question." Defense counsel explained that Rivera "testified in the Grand Jury to a struggle that occurred. That Mr. Bulus recognized [defendant], he came after him. That in the course of that encounter there was a struggle and that a shot went off and that he shot him." He then made multiple arguments as to why the testimony should come in: (1) it is a statement against interest; (2) it is an excited utterance; and (3) it is a statement of a co-conspirator in furtherance of the conspiracy.

- 7 -

The state responded that the statement is subject to *State v. Harnois*, 638 A.2d 532 (R.I. 1994), because it is "an attempt to put forward exculpatory self-serving statements through this witness of the defendant, a witness who the State has no access, no ability to challenge."[1] The state additionally argued that the conspiracy claim was dismissed against defendant, therefore it would not fall under that exception and that if there was a conspiracy to purchase marijuana, it "was over by the time that the marijuana was not purchased." The trial justice indicated that he agreed with the state and concluded that,

> "this is overridden by *Harnois*, and it's an effort on behalf of the defense to put in a statement that is clearly in the realm of exculpatory, such that it could later be used as a stepladder to claiming that this was an accidental shooting or some sort of self-defense. But the fact that he pulled the trigger and shot somebody in and of itself does not lead to the conclusion that it is a statement against interest."

He therefore sustained the objection, indicating that what defendant was "trying to put before the jury, in [his] view, is clearly running afoul of *Harnois* and its legacy."

The trial justice reiterated his position on the matter at the end of the second day of trial, stating that the testimony defendant wanted to elicit from Rivera "was unquestionably afoul of *Harnois* and its progeny." The trial justice quoted *State v. Chum*, 54 A.3d 455 (R.I. 2012), in support of his decision, stating that "a defendant in a criminal case is not entitled to have his version of events introduced through the

---

[1] We note that, at this point, defendant had not testified.

testimony of other witnesses." (Quoting *Chum*, 54 A.3d at 464.) He then addressed defendant's argument that the testimony was a statement against interest pursuant to Rule 804(b)(3) of the Rhode Island Rules of Evidence. Quoting the language of the rule and relying on this Court's ruling in *State v. Firth*, 708 A.2d 526 (R.I. 1998), the trial justice determined that "[t]here was no indication anywhere relating to the 'trustworthiness of the statement' that [defense counsel] suggested should be elicited." Because such a finding is necessary for the statement to come in pursuant to Rule 804(b)(3), the trial justice rejected defendant's argument in that respect. It appears that the only argument the trial justice did not address was defendant's contention that this statement falls within the excited utterance exception to the hearsay rule.

Patricia Ogera, M.D., an assistant medical examiner, was qualified as an expert in the field of forensic pathology and testified that she performed an autopsy on the decedent. The autopsy report was entered into evidence as a full exhibit. In the autopsy report, Dr. Ogera detailed the gunshot wound and then described "[o]ther [i]njuries" of the decedent:

> "On the right shoulder and axilla is an 8-1/2 x 2-1/4 inch, gray-blue to purple area of contusion with a 1-3/4 inch area of sparing between. On the right palm is a 1/16 inch, brown abrasion. On the right elbow is a 3/4 x 3/8 inch, red-brown abrasion. On the dorsal right index finger is a 1/4 x 1/8 inch, red-brown abrasion near the nail. There is purple discoloration of the dorsal right knuckles. On the left forearm are several 1/16 - 1/8 inch, red to red-brown

- 9 -

> abrasions. On the dorsal left hand is a 1/8 inch, red abrasion. On the left ring and little fingers are approximately 1/4 inch, red to red-tan abrasions. On the right knee are two tan-pink abrasions measuring 5/8 inch and 3/8 inch. On the distal anterior left thigh is a 3/8 x 1/8 inch, red abrasion."

She was not asked at trial whether those injuries resulted from the altercation between defendant and the decedent. In her autopsy report, under the decedent's clinical history, Dr. Ogera also noted that he had sustained a gunshot wound to his face in 2020. Doctor Ogera concluded that the cause of death was a gunshot wound to the back of the torso.

After the state rested, defendant moved for a judgment of acquittal on counts two and three, which motion was denied by the trial justice. The jury ultimately found defendant not guilty of first-degree murder, guilty of second-degree murder, guilty of discharging a firearm during a crime of violence, namely murder, and carrying or possessing a pistol without a license. On April 7, 2023, defendant filed a motion for a new trial based on the weight of the evidence, arguing that the state failed to produce evidence as to when defendant drew his weapon and who initiated the confrontation inside the vehicle. Specifically, defendant took issue with the jury's finding that "[d]efendant acted with malice and premeditation" because such a "conclusion could only be based on guessing and speculation, the very solving of a mystery that they are not entitled to engage in. It is not the jury's province to 'fill

in the blanks', it is the State's responsibility." That motion was heard on May 19, 2023, and the trial justice denied the motion in a written order.

The trial justice began by noting that defendant did not challenge his conviction on count four. He then laid out the three-step evaluation process he would undertake in reviewing defendant's motion for a new trial and indicated that "[a]dditional examination is needed only if the trial judge disagrees with the jury's verdict." He next addressed defendant's argument that "because there were no witnesses, no one except for Garcia knew what had occurred during those seventeen seconds." In rejecting this argument, the trial justice relied on Dr. Ogera's autopsy report that "numerous injuries [were] found on the decedent's body, aside from the gunshot wound to Bulus's back," and he further disagreed with defendant that "because no one asked Dr. Ogera whether those injuries were fresh, they cannot be attributed to a struggle between the men." The trial justice reasoned that "Dr. Ogera did not describe Bulus's injuries as 'old'; she simply listed them as his 'other injuries[,]'" and he further highlighted that she also identified an older injury: a gunshot wound to the right side of Bulus's face. He was therefore "satisfied that the injuries listed by Dr. Ogera resulted from a physical altercation in the car between Bulus and the defendant" and that the jury plainly rejected defendant's theory of "the shooting as an accident or at least a result of self-defense."

In discussing the self-defense claim, the trial justice stated:

"[The defendant] was a known drug dealer and had supplied contraband to Yazmin Rivera and others for a long period of time before she tried to separate herself from narcotics. Even so, when contraband was needed, she knew she could rely on Garcia, who was willing to provide it with a loaded gun within easy reach. Having purposefully introduced the weapon into the event and having been responsible for inflicting numerous injuries upon Bulus and shooting him in the back as a final flourish, the jury was well-warranted in rejecting Garcia's claim of self-defense."

The trial justice then turned to defendant's accident defense, finding that "the credible evidence demonstrated that Garcia was intent on selling marijuana to Bulus, but not without a weapon. * * * An altercation quickly occurred after Garcia entered Bulus's vehicle. Garcia sustained minimal injuries, but he inflicted several upon Bulus and shot and killed him." He went on to state that defendant then "retreated to Lewis's vehicle and told him that Bulus had attacked him and tried to rob him[,]" but defendant admitted at trial that such an explanation was not given to detectives. The trial justice found that, "[a]fter returning to the residence, Garcia disposed of the spent casings, got rid of the gun, and fled the state."

The trial justice cast doubt on defendant's credibility and ultimately observed that "it is a small wonder that the jury convicted him of murder." He found the testimony of Detective Theodore Michael, Rivera, and Lewis to be credible, and he noted that "[t]he jury was justified in accepting their testimony." Addressing defendant's argument that the state provided no direct evidence to support a murder

- 12 -

charge, the trial justice found that "the law does not require the state to dispel [other explanations for Bulus's death]." Citing *State v. Caruolo*, 524 A.2d 575 (R.I. 1987), the trial justice stated: "As the Supreme Court has held, the state is simply not required to disprove every reasonable hypothesis of innocence as long as the totality of the circumstances, including direct and circumstantial evidence, generate proof of guilt beyond a reasonable doubt." He was ultimately satisfied with the jury's verdict.

The defendant was sentenced to twenty-five years' imprisonment for the second-degree-murder conviction, a consecutive mandatory life sentence for the conviction for discharge of a firearm during a crime of violence, namely murder, and ten years for the carrying-without-a-license conviction, to be served concurrently with count two. A judgment of conviction entered on November 15, 2023, and defendant filed a premature but valid notice of appeal.

## II

### Discussion

The defendant advances two arguments on appeal. First, defendant contends that "[t]he trial justice prejudicially erred in excluding Yazmin Rivera's testimony that shortly after the shooting, while he was still laboring under stress of the event, [defendant] told her that Isaias Bulus attacked him and amid a struggle, the gun went off, and he shot Bulus." Second, defendant avers that "[t]he trial justice erred in

- 13 -

denying a motion for a new trial by making clear errors and misconceiving and overlooking material evidence." We address each claim of error *seriatim*.

**Exclusion of Testimony**

This Court "review[s] a challenge to a trial justice's limitation on cross-examination under an abuse of discretion standard, and we will not disturb the exercise of that discretion absent a clear abuse of discretion." *State v. Covington*, 69 A.3d 855, 862 (R.I. 2013) (quoting *Chum*, 54 A.3d at 460). "To constitute a clear abuse of discretion, the trial justice's ruling excluding the evidence must amount to 'prejudicial error.'" *Id.* (quoting *Chum*, 54 A.3d at 460).

On appeal, defendant argues that, "[i]n deciding to exclude [Rivera's testimony as to what defendant said to her after the shooting,] the trial justice misapplied *Harnois* because the defendant testified and was subject to cross-examination." The defendant further submits that the excluded testimony was admissible as an excited utterance pursuant to Rule 803(2) of the Rhode Island Rules of Evidence and that the trial justice erred in failing to address this argument at trial. Lastly, defendant posits that the exclusion of Rivera's testimony was prejudicial error, and defendant should be granted a new trial.

In response, the state submits that the trial justice properly excluded Rivera's testimony based on *Harnois*. The state notes that "it is undisputed that the trial justice precluded Rivera from testifying about the Defendant's alleged statement

*before* the Defendant testified" and that defendant "never advised the trial justice that he was going to testify when seeking to ask Rivera about what he said on the night of the murder." The state further proffers that, if this Court were to decide that the trial justice erred in applying *Harnois* and excluding Rivera's testimony, such error was harmless. It also suggests that defendant could have, during his case-in-chief, recalled Rivera to the witness stand and again attempted to elicit the statements.

With regard to defendant's excited-utterance argument, the state contends that "[t]he trial justice did not address the Defendant's excited utterance argument, presumably because the excited utterance exception was of no consequence to the analysis once the trial justice found that *Harnois* precluded him from eliciting testimony about the statement." It also suggests that, even if *Harnois* did not apply, defendant's attempt to admit his statements as excited utterances would likely fail because, by the time he made the statements to Rivera, he was "thinking clearly" and "had the capacity for reflection[,]" thus removing such statements from the species of excited utterances.

We begin by addressing whether the trial justice erred in applying *Harnois* to prevent Rivera from testifying as to the statements made by defendant after the shooting. In *Harnois*, the defendant attempted to introduce statements he made to police that were contained in police records. *Harnois*, 638 A.2d at 535. He argued

- 15 -

that those statements should have been admitted under either Rule 801(d)(2)(B) (statement by party opponent) or Rule 803(24) (other exceptions to hearsay) of the Rhode Island Rules of Evidence. *Id.* This Court found Rule 801(d)(2)(B) "clearly inapplicable[,]" but offered a more comprehensive explanation as to why the statements were not admissible under Rule 803(24), which acts as a "catchall hearsay exception." *Id.* The Court explained that the Rule 803(24) "exception is 'not to be used as a device for allowing a defendant to prove material facts through affidavit or unsworn statements as a substitute for his own testimony merely because such statements have found their way into an agency record.'" *Id.* (quoting *State v. Germano*, 559 A.2d 1031, 1037 (R.I. 1989)).

This Court has maintained that, if a defendant exercises the right not to testify at trial, the defendant cannot later introduce his own testimony through other means. *See Chum*, 54 A.3d at 464 (holding that a defendant is "not entitled to have his version of events introduced through testimony of other witnesses"); *State v. St. Michel*, 37 A.3d 95, 102 (R.I. 2012) (stating that a defendant who chooses not to testify "cannot use the state's witnesses as conduits for her own out-of-court statements").

Because the defendant in *Harnois* waived his right to testify, he could not "testify by other means, including by way of the unsworn statements made to police." *Harnois*, 638 A.2d at 535-36. This Court held that admitting the

- 16 -

"defendant's statements under either rule would be to ignore the rules' well-established and unambiguous guidelines. The defendant was seeking to offer testimony through his statements, which might raise reasonable doubt in the minds of a jury, yet would deprive the state of the opportunity of cross-examination. The rules of evidence will not be manipulated in this way." *Id.* at 536.

In *State v. Dennis*, 893 A.2d 250 (R.I. 2006), this Court further expounded on the principle set forth in *Harnois*. *Dennis*, 893 A.2d at 264. There, unlike the defendant in *Harnois* who waived his right to testify, the defendant "sought to give greater credence to the testimony that he planned to give" by asking detectives about a statement they allegedly made to defendant. *Id.* This Court held that the "defendant should have been permitted to attempt to elicit this testimony from the detectives, since it might have had a bearing on the jury's assessment of voluntariness." *Id.*

The Court's intention in *Harnois* and subsequent cases was seemingly to avoid allowing a defendant to introduce his own statements into evidence without taking the witness stand, "thus depriving the prosecutor of the opportunity to cross-examine the proponent of those statements, defendant himself." *State v. Bustamante*, 756 A.2d 758, 764 (R.I. 2000). In the case at bar, however, defendant *did* testify. The issue then becomes the timing of defendant's testimony—meaning, is it enough that the trial justice was aware that defendant planned to testify or must defendant have already testified at the time that defense counsel attempted to bring in defendant's statements through the testimony of Rivera to overcome *Harnois*?

- 17 -

In our review of *Harnois* and its progeny, we located only one case that provided guidance on this issue; in the majority of cases either (1) the defendant did not testify and *Harnois* barred the defendant from eliciting the out-of-court statements through other witnesses, or (2) the statement being elicited was not made by the defendant and *Harnois* was not implicated. *See, e.g.*, *Chum*, 54 A.3d at 464 (holding that "the trial justice properly precluded the defendant from eliciting his statement to police during the cross-examination" of two witnesses in a case where the defendant did not testify); *Dennis*, 893 A.2d at 264 (holding that *Harnois* was not implicated because the statement at issue was made *to* the defendant by detectives). In *State v. Hazard*, 785 A.2d 1111 (R.I. 2001), however, during the state's case-in-chief, "the state introduced the [defendant's] suicide note the trooper found without an objection from defendant. On cross-examination, however, when defendant's attorney attempted to find out what defendant said to the trooper at the grave site, the prosecution objected on the basis of *State v. Harnois*," which the defendant claimed was in error. *Hazard*, 785 A.2d at 1118 (footnote omitted). On appeal, the defendant argued that the statement should have been admissible pursuant to Rule 803(3) or 803(24). The Court rejected both arguments on the merits and stated that, even if the defendant complied with the notification requirement in Rule 803(24), "the *Harnois* rule still barred the admission of this statement into evidence." *Id.* at 1119. Notably, in further commentary and review of the exclusion

- 18 -

of the defendant's statements to the trooper, the Court indicated that "[t]he defendant himself testified * * *." *Id.* *Hazard* is therefore instructive with respect to the issue before us because, much like in the case at bar, defense counsel's attempt to elicit statements of the defendant through a witness was barred by *Harnois* during the state's case-in-chief even though the defendant later testified. *See id.*

Although we agree with defendant that it appears everyone understood that defendant *planned* to testify, "[i]n a criminal matter, a defendant has no burden of proof and may choose not to testify *at any time*." *State v. Gaspar*, 982 A.2d 140, 150 n.13 (R.I. 2009) (emphasis added).[2]  It follows that the timing of a defendant's testimony is paramount in the application of *Harnois*; and we cannot say that the trial justice erred in applying *Harnois* when defendant had not yet testified.  As the state suggested, after defendant testified, he could have recalled Rivera in order to overcome *Harnois*.

Accordingly, it is clear that the trial justice did not err in applying *Harnois* in the case at bar when defense counsel attempted to cross-examine Rivera during the state's case-in-chief.  In the face of this conclusion, we deem the trial justice's failure

---

[2] Notably, during the sidebar when the prosecutor raised the objection pursuant to *State v. Harnois*, 638 A.2d 532 (R.I. 1994), the prosecutor specifically argued that he would not be able to cross-examine defendant.  At that point, defense counsel made no suggestion that defendant planned to testify and merely suggested that the prosecutor could "certainly cross-examine his own witness[,]" meaning Rivera.

to address defendant's excited utterance argument harmless error, because it still would have been barred by *Harnois*.

**Motion for a New Trial**

"Under the oft-repeated and well settled test this Court applies when reviewing a motion for a new trial, we examine whether the trial justice acted as a thirteenth juror and exercised his or her independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Vidot*, 253 A.3d 401, 409 (R.I. 2021) (quoting *State v. Stokes*, 200 A.3d 144, 152 (R.I. 2019)). "When considering a motion for a new trial, the trial justice must undertake a three-step analysis: (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *Id.* (brackets omitted) (quoting *Stokes*, 200 A.3d at 152).

"If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *Vidot*, 253 A.3d at 409 (quoting *State v. Johnson*, 199 A.3d 1046, 1051 (R.I. 2019)). "This Court's review of a denial of a motion for a new trial is deferential because the trial justice is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Id.* (brackets omitted) (quoting *Johnson*, 199 A.3d at 1051). "If the trial

justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." *Id.* (quoting *Johnson*, 199 A.3d at 1051).

On appeal, defendant argues that the trial justice is owed no deference in his order denying defendant's motion for a new trial because "he got basic and fundamental facts wrong, and relied on evidence that was not admitted at trial." Specifically, defendant emphasizes that the trial justice erred in identifying defendant "as a 'known drug dealer' who 'supplied contraband to Yazmin Rivera and others for a long period of time' and was 'intent on selling marijuana to Bulus.'" The defendant contends that this error, in a written order, was not "a simple mix-up of two people," but rather "this false narrative appears to be the trial justice's mistaken recollection of the events at trial." He additionally highlights that, "[a]long with the trial justice's factual errors, he also relied on prejudicial information that was never presented at trial—that [defendant] fled the state after the shooting." The defendant submits that "[t]hese errors clouded the lens through which the trial justice reviewed the case and casts doubt on all of the trial justice's findings in denying the motion for a new trial" and that they constitute clear error.

The state characterizes the first error as a "mix-up" and argues that we "should afford the trial justice deference, even in light of this, because the respective roles of

the Defendant and Bulus had no impact on the trial justice's analysis of the altercation in the car." Furthermore, in a footnote, the state acknowledges that defendant's "flight out-of-state, after the shooting, never came into evidence[,]" but that the "brief mention was inconsequential when compared to the other evidence that the trial justice highlights in his decision." The state argues that these "factual inaccuracies do not negate the trial court's well-reasoned and thorough denial of the Defendant's motion."

It is apparent to us that the trial justice in this case was clearly wrong when he stated that defendant "was a known drug dealer and had supplied contraband to Yazmin Rivera and others for a long period of time before she tried to separate herself from narcotics. Even so, when contraband was needed, she knew she could rely on Garcia, who was willing to provide it with a loaded gun within easy reach." The trial justice then went on to state, incorrectly, that "*the credible evidence demonstrated* that Garcia was intent on selling marijuana to Bulus, but not without a weapon." (Emphasis added.) Both of these statements are incorrect based on the record before us and are a clear misconception of the evidence, as testified to by defendant, as well as the two witnesses whom the trial justice deemed credible: Rivera and Lewis.

There is nothing in the record to indicate that defendant was a "known drug dealer"; rather, it is undisputed that he was the buyer in the case before us. We agree

with defendant that "[t]his error skews the lens through which the trial justice analyzed the evidence and sequence of events." Indeed, the material evidence that the trial justice misconceived is so basic as to taint the validity of the written order. Casting defendant as the drug dealer rather than as the buyer affected the trial justice's review of defendant's claims of both self-defense and accident because the mischaracterization was part of his analysis on each of those issues. This error is compounded by the trial justice's consideration of evidence outside of the record—that defendant fled the state. Such a fact was not in the record and should not have been considered in the trial justice's analysis.

Accordingly, we hold that the trial justice was clearly wrong in his order denying defendant's motion for a new trial. We are cognizant, however, that the error does not implicate the jury's analysis of the evidence. Consequently, we believe that a new hearing on the motion for a new trial is the appropriate remedy.

The state avers that we should afford the trial justice deference notwithstanding his mischaracterization of defendant as the seller of the marijuana "because the respective roles of the Defendant and Bulus had no impact on the trial justice's analysis of the altercation in the car." We disagree. The transposition of the "roles" played by defendant in this criminal transaction is so fundamental that it draws into question the trial justice's ruling on the motion for a new trial. We cannot

say for certain whether it was a mere slip of the pen or a basic misunderstanding of the evidence advanced at trial.

The defendant also argues that the trial justice misconceived and overlooked material evidence in his order denying the defendant's motion for a new trial. In light of our decision to remand the case for a new hearing on the defendant's motion for a new trial, we decline to address these evidentiary issues at this juncture. *See State v. Luanglath*, 749 A.2d 1, 6 (R.I. 2000).

### III

### Conclusion

For the reasons set forth herein, we vacate the order denying the defendant's motion for a new trial and remand the case for a new hearing on the motion for a new trial in accordance with this opinion. The record may be returned to the Superior Court.

Justice Goldberg participated in the decision but retired prior to its publication.

**Justice Long, with whom Justice Lynch Prata joins, dissenting.** We respectfully dissent from the majority's decision to remand this case for a new hearing on the defendant's motion for a new trial. Given the trial justice's clear

misconception of the evidence in this case and his reliance on facts that were not in the record, we believe that a new trial is warranted. We recognize that it is extremely rare for a trial justice to grant a new trial, and even rarer still for this Court to grant a new trial on appeal from a denial of a motion for a new trial. *See State v. Savard*, 297 A.3d 901, 906 n.3 (R.I. 2023). The error in this case warrants such an exceptional remedy.[1]

Rule 33 of the Superior Court Rules of Criminal Procedure authorizes a trial justice to grant a defendant a new trial in the interest of justice. Super. R. Crim. P. 33. Two days after the jury returned its verdict, Mr. Garcia invoked this rule, seeking a new trial on three grounds: (1) that the jury misapplied the law as dictated in the jury instructions; (2) that the jury's verdict was against the weight of the evidence; and (3) that the jury's verdict was based on "speculation, assumption, surmise and conjecture, not on direct or even circumstantial evidence." The defendant filed written memoranda in support of his motion,[2] and the motion came on for hearing

---

[1] Because we conclude that a new trial is warranted and would, therefore, vacate Mr. Garcia's judgment of conviction, we do not address the evidentiary issue concerning the testimony of Yazmin Rivera.

[2] The state's memorandum in opposition is not in the record.

on May 19, 2023, approximately six weeks after the jury returned its verdict.[3]  The trial justice took the matter under advisement.

The task of a trial justice who considers a motion for a new trial is well-settled: "[The] trial justice assumes the role of a superjuror because of his or her experienced judgment." *State v. Girouard*, 561 A.2d 882, 890 (R.I. 1989).  As a superjuror, the trial justice must comply with an established standard in considering the motion. *See State v. Luanglath*, 749 A.2d 1, 3-4 (R.I. 2000).  Specifically, the trial justice must undertake certain steps: first, a trial justice must "consider the evidence in light of the charge given the jury"; second, the trial justice must "determine his or her own opinion of the evidence: what weight and credibility does he or she give to the witnesses and other evidence, and what conflicting testimony and evidence does the trial justice accept or reject"; third, "in his or her independent assessment of the evidence and in light of the charge to the jury," the trial justice must determine

---

[3] We do not suggest that the trial justice or the parties were not diligent in scheduling a hearing on the motion for a new trial.  It is clear from publicly available records that the Gun Calendar was exceedingly busy during the time frame at issue.  By our count of those records, in the roughly eight weeks surrounding Mr. Garcia's trial and the hearing on his motion for a new trial, the trial justice was scheduled to hear approximately 435 distinct matters involving 250 different case numbers and 210 different defendants.  Many of those cases, by statutory designation, related to "the illegal possession and use of guns and other dangerous weapons * * *." G.L. 1956 § 8-2-15.1(c) (creating Gun Court Calendar).  And several of those cases are ones with which this Court is familiar; some, like this case, involved both guns and a transaction for the purchase of drugs that occurred in a vehicle and that resulted in a death. *See State v. Xaykosy*, 352 A.3d 188, 191-92 (R.I. 2026).

- 26 -

whether he or she would have reached a different result; and, fourth, if the trial justice differs with the jury in the ultimate conclusion as to the result of the case, "the trial justice must then determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." *Girouard*, 561 A.2d at 890-91. The trial justice must also articulate enough facts to demonstrate that he or she has complied with this established standard. *Luanglath*, 749 A.2d at 4. Where the record reveals that the trial justice has failed to comply with the established standard, this Court will remand the matter for reconsideration. *See, e.g.*, *id.* at 4-6.

In this case, the trial justice issued a written order on May 30, 2023. In the written order, the trial justice characterized testimony and evidence relevant to Mr. Garcia's self-defense claim as follows:

> "The self-defense claim was extremely weak and easily overcome beyond a reasonable doubt. After all, it was Garcia who brought the gun into the car that evening (which he denied to the detectives). He was a known drug dealer and had supplied contraband to Yazmin Rivera and others for a long period of time before she tried to separate herself from narcotics. Even so, when contraband was needed, she knew she could rely on Garcia, who was willing to provide it with a loaded gun within easy reach."

The trial justice stated that "the credible evidence demonstrated that Garcia was intent on selling marijuana to Bulus, but not without a weapon." And further, that after disposing of the gun, Garcia "fled the state."

These "facts" as articulated by the trial justice demonstrate that, even though he went through the steps of the established standard, the trial justice, acting as the superjuror, misapprehended several important aspects of the evidence introduced at trial. This is thus a case where the trial justice was "clearly wrong." *State v. Vidot*, 253 A.3d 401, 409 (R.I. 2021). In such a case, our standard requires that this Court overturn his decision. *Id.*

The trial justice's errors are particularly glaring because the instant case presented the court and the jury with a question of credibility—whether to believe Mr. Garcia's description of the nearly instantaneous altercation in the vehicle and thus believe his claim of self-defense or accident, or not. An understanding of the basic facts about which Mr. Garcia testified was therefore central to the ability of the trial justice to decide whether Mr. Garcia's defenses were supported by the evidence. In reaching his conclusion, however, the trial justice relied almost entirely on a series of facts with absolutely no factual support in the testimony before the jury; namely, that Mr. Garcia was (1) a drug dealer who (2) "had supplied contraband to Yazmin Rivera and others for a long period of time before she tried to separate herself from narcotics," that (3) Ms. Rivera "knew she could rely on Garcia, who was willing to provide [drugs] with a loaded gun within easy reach," and further that (4) "Garcia was intent on selling marijuana to Bulus, but not without a weapon" before (5) fleeing the state.

As our colleagues in the majority describe, the trial justice's "transposition of the 'roles' played by defendant in this criminal transaction is so fundamental that it draws into question the trial justice's ruling" because it may reflect a "basic misunderstanding of the evidence advanced at trial."[4]  Indeed, the majority concludes that it was error for the trial justice to transpose the defendant's and decedent's roles because it "affected the trial justice's review of defendant's claims of both self-defense and accident" and was compounded by the trial justice's consideration of evidence that was not adduced at trial and therefore was not before the jury when it considered Mr. Garcia's culpability.  The majority concludes, however, that it cannot order a new trial because these obvious errors do "not implicate the jury's analysis of the evidence."  We fully agree with our colleagues with respect to the errors they identify, but we respectfully disagree with their assessment of the appropriate remedy.

In *State v. Luanglath*, 749 A.2d 1 (R.I. 2000), where this Court granted a new hearing on appeal from the denial of a motion for a new trial, we were confronted

---

[4] The majority also suggests that the trial justice's error could have been a "mere slip of the pen * * *."  That rationale fails to persuade us, however, given that the trial justice issued a *written* order—eleven days after the hearing on defendant's motion—in which, in addition to the errors discussed, he also referred to both the decedent and a codefendant by the wrong name and referred to facts that were not in the trial record.  The cumulative effect of these errors heightens our concern that the trial justice's misapprehension of the facts of this case deprived defendant of a fair trial.

with a trial justice's error in the implementation of this Court's established standard for considering such a motion. *Luanglath*, 749 A.2d at 4-6. This is not that case. Here, the trial justice's errors bespeak a misapprehension of the basic underlying facts of the case that raises doubts as to the fairness of Mr. Garcia's trial overall, not with the application of this Court's established standard for considering the motion. To be sure, that misapprehension came to the surface in the trial justice's motion for a new trial decision, but the seeds of those errors were planted over the course of the testimony of the six witnesses in this case. We cannot discern whether they obscured the trial justice's front-row view of the trial, *see State v. Neugent*, 218 A.3d 1011, 1016 (R.I. 2019), and thus impacted the jury's ultimate verdict.

A remand for the trial justice to repeat the motion for a new trial hearing and issue a new decision in this case fails to provide an adequate remedy to Mr. Garcia, who has spent several years incarcerated at the Adult Correctional Institutions following a trial presided over by a judge who plainly misunderstood the evidence in the case before him.

Where, two months after presentation of the evidence, the superjuror's recounting of basic, material facts regarding who did what leading up to, during, and after, the encounter in the vehicle is so glaringly incorrect and painted the defendant as a gun-wielding drug dealer, it is difficult to believe that the interests of justice are

- 30 -

served by asking that same superjuror to recall those facts, for a second time, almost three years later.

We acknowledge the rarity and gravity of any decision to overturn a trial justice's decision to deny a motion for a new trial. Nevertheless, the error in this case is exceptional and, under our standard of review, entitles Mr. Garcia to a new trial. If this Court's oft-repeated refrain that we will overturn a trial justice only when they have "misconceived material evidence relating to a critical issue or if [they were] otherwise clearly wrong" means anything, it must mean that this defendant, whose trial justice clearly misconceived material evidence and was clearly wrong, is entitled to have the decision on his motion for a new trial overturned. *State v. Moore*, 154 A.3d 472, 481 (R.I. 2017). Overturning that decision means granting Mr. Garcia a new trial.

Because the majority orders only that Mr. Garcia is entitled to a new hearing, we respectfully dissent.

**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Adauris Garcia. |
| **Case Number** | No. 2024-265-C.A. (P1/21-3623BG) |
| **Date Opinion Filed** | April 27, 2026 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General<br>For Defendant:<br><br>Camille A. McKenna<br>Rhode Island Public Defender |